UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| NATALIE KARIL GOUDY,<br><br>Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | 4:17-CV-04171-KES<br><br>MEMORANDUM OPINION AND ORDER AFFIRMING THE DECISION OF THE COMMISSIONER |

Plaintiff, Natalie Karil Goudy, seeks review of the decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits (SSDI) under Title II of the Social Security Act, 42 U.S.C. § 423. The Commissioner opposes the motion and urges the court to affirm the denial of benefits. For the following reasons, the court affirms the decision of the Commissioner.

## PROCEDURAL HISTORY

Goudy filed an application for SSDI benefits on February 18, 2014, alleging disability since August 31, 2013. AR 263, 317. The Commissioner denied her claim initially on August 1, 2014, and upon reconsideration on December 1, 2014. AR 189, 193. Goudy then appeared with counsel before Administrative Law Judge (ALJ) Hallie E. Larsen at an administrative hearing on November 16, 2016. *See* AR 105 (transcript of hearing). The ALJ issued an opinion affirming the denial of benefits on January 10, 2017. AR 13. The

Appeals Council denied Goudy's request for review on November 6, 2017. AR 1. Thus, Goudy's appeal of the Commissioner's final decision is properly before the court under 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

Goudy was born November 17, 1988. AR 161. She was 24 years old on the amended alleged onset date, and thus one day shy of her 28th birthday at the time of her hearing before the ALJ. AR 107. Goudy completed the 12th grade and received her high school diploma. AR 110. She has worked numerous jobs in retail, waitressing, and secretarial work, among other various part-time jobs for a short period of time. AR 111.

Goudy has a history of several medical impairments, including obesity, diabetes, bipolar disorder, anxiety disorder, and borderline personality disorder. *See* AR 575, 588. She also has bursitis in her left shoulder following a fall that she treated through physical therapy in 2016. AR 866-906.

Goudy has received care at the Lanning Center for Behavioral Services for psychotropic medication management. AR 517. She has also received care at the Howard Community Health Center for various issues. *See* AR 591-625. According to a progress note from the Howard Community Health Center, when the provider recommended therapy for Goudy's worsening depression, Goudy stated that seeing a therapist has "always been such a hassle." AR 548. In another note from November 27, 2013, Goudy noted more headaches, she has been "feeling very sick weak dizzy" for about a month, and she has had chest pain or discomfort from stress, but the medical provider's physical findings

showed no abnormalities. AR 549-51. The provider recommended ways for Goudy to stabilize her blood sugar and glucose levels, encouraged counseling, and encouraged a regular eating schedule for diabetic maintenance. AR 552.

Goudy presented to the emergency room at Avera Queen of Peace in Mitchell, South Dakota on December 8, 2013, for a headache and cough, but was discharged after her head CT scan and chest X-ray were normal. AR 640-41. She presented to the same emergency room again on January 25, 2014, for low blood sugars, intermittent diarrhea, and nausea, but was discharged with instructions to maintain good dietary control at home for her diabetes. AR 653. During another visit to the same emergency room on August 18, 2014, Goudy complained that "her brain hurt" but denied any headaches. AR 669. Based on her normal physical exam and normal labs, the emergency room doctor referred her back to her primary care provider. AR 670.

On April 3, 2014, Goudy presented to the Huron Regional Medical Center (HRMC) emergency room for abdominal pain. AR 564. It was noted that Goudy "is very manic and hard to follow," and she "will laugh and smile" but told the doctor her "pain is a 10." *Id.* On April 18, 2014, Goudy again presented to the emergency room at HRMC with complaints of abdominal pain, nausea, and heartburn. AR 556. She reported "pain is a 9-10/10" but the doctor noted she "sits up having conversation without any difficulty." *Id.* An X-ray of her abdomen appeared normal and she was discharged with magnesium citrate for constipation. AR 560-61.

Goudy also received care in 2014 and 2015 from Dr. Lyle Christopherson, a psychiatrist at Community Counseling Services in Huron, South Dakota. *See* AR 574-78. During an April 7, 2014 visit, Dr. Christopherson noted Goudy's medication history, explaining the side effects Goudy felt from numerous antipsychotic medications, and he noted Goudy's trouble with concentration, anxiety, poor energy levels, and poor sleep habits. AR 574. He prescribed her Latuda, but when he examined her one month later, he noted that she "had a miserable time with" the Latuda. AR 577. In the same note, Dr. Christopherson stated, "I'm not sure exactly what her motives are for getting better." *Id.* On July 22, 2014, Dr. Christopherson examined Goudy again but noted that once her Depakote level increases, he believed she would sleep better and be in more control. AR 587. On September 3, 2014, Dr. Christopherson noted that Goudy "desperately needs DBT [dialectical behavior therapy]" but she has refused to participate, and he noted his belief that disability has been Goudy's "primary goal all along." AR 588. She continued to see Dr. Christopherson but missed or canceled some appointments. AR 747, 752. As he continued to manage her medications, Dr. Christopherson's notes from 2015 show that Goudy's progress fluctuated. AR 753-58.

Dr. Tracy Davies with the South Dakota Disability Determination Services examined Goudy on July 10, 2014. AR 579-85. Dr. Davies determined that Goudy's diabetes and hypothyroidism, which she found to be medically managed, would not prevent Goudy from working, but Goudy had significant psychiatric issues. AR 583. She concluded that Goudy "seems to lack

4

motivation to take better care of her health and improve her morbid obesity."
*Id.*

Goudy also had many individual psychotherapy sessions at Dakota Counseling Institute between 2014 and 2016. AR 733-44, 781-92. It was noted that mismanagement of her diabetes and thyroid problems contributed to Goudy's irritability and impulsiveness, so Goudy was encouraged to follow up with her provider on her physical health needs, which directly impacted her emotional functioning. AR 737. At the next session, on March 19, 2015, Goudy discussed how her physical health issues prevented her from completing job responsibilities. AR 738. The counselor determined that Goudy had attempted to work an eight-hour shift without drinking any water or eating. *Id.* The counseling notes state that Goudy "hesitated to accept her negligence in managing her diabetes." *Id.* In February 2016, Goudy participated in a DBT group psychotherapy session, and the clinician's notes indicate that Goudy's participation was positive. AR 912. But notes from subsequent individual psychotherapy sessions reference Goudy's justifications for missing sessions, anger at the therapist, and irritation. AR 913-15. In a progress note dated September 23, 2016, Goudy's mental health clinician reminded Goudy that her physical and emotional health stabilized while she was employed as a waitress, and Goudy agreed "but denied the need to return to work because she is 'so close to being approved for SSI.' " AR 930.

# ADMINISTRATIVE HEARING

During the administrative hearing, the ALJ heard testimony from Goudy and Warren Haagenson, a vocational expert. Goudy, represented by counsel at the hearing, testified about her work experience and the difficulties she has had physically and mentally while working. AR 111-15. She testified that her two most recent jobs were as a waitress, but one job lasted only two or three months because she did not get along with her coworkers, suffered from anxiety attacks, and the job caused her hip pain. AR 111. The other waitressing job ended because of her anxiety attacks as well. AR 112-113.

Goudy testified that she participates in counseling, sees her psychiatrist, Dr. Christopherson, and just started hypnotherapy to treat her anxiety. AR 113-14. She also testified about her physical impairments that interfere with working. These include her left hip sliding out of place, bad joints, Type 2 diabetes, and hypothyroidism. AR 115. She stated that low and high blood sugar levels affect her mood, ranging from erratic or irritated behavior to angry yelling. *Id.* Goudy also testified that she suffers from bursitis in her left shoulder and Osgood-Schlatter's in her knee. AR 116. Goudy noted that she takes the medications prescribed by Dr. Christopherson for her mental health issues (AR 114) and she takes Metformin and Levothyroxine for her diabetes (AR 116).

During a typical day, Goudy cares for her three dogs and other small animals. AR 117. She feeds, dresses, and bathes herself, but struggles getting in and out of the bathtub. *Id.* She does her own laundry and prepares quick

meals for herself in the kitchen but does not clean up the kitchen for a couple of days because she lacks motivation and becomes distracted. AR 117-18. And while she does her own grocery shopping, she often rides a scooter to avoid hip pain and she tends to buy more than she needs. AR 118. She spends time on her phone or computer, usually on Facebook. AR 119. She also testified that she has trouble keeping relationships with friends, family, or coworkers. AR 120.

Goudy testified that she cannot sit for longer than 30 minutes due to her hip pain and her inability to concentrate for a long period of time. AR 121. She further testified that she cannot walk more than a block at a time and cannot stand for more than 15 minutes at a time. AR 123. Out of a 30-day period, Goudy testified that four or five days are good days for her, while the rest are bad days. AR 127. And while she has forced herself to go to work on bad days, she testified that they do not end well, and she usually goes home in tears or anger. AR 128.

Haagenson prepared a form indicating that Goudy did not have any past relevant work experience that she could perform. AR 131; *see also* AR 406. In response to the ALJ's first hypothetical, Haagenson testified that someone with Goudy's limitations could perform "the medium classification of work," such as a dishwasher, night cleaner, or a hand packager. AR 132. The ALJ then posed a second hypothetical to Haagenson, which included more limitations. AR 133. In response to this second hypothetical, Haagenson testified that a person could perform light work, such as a small parts assembler, hand packager, or a

collator operator. AR 133-34. When asked by Goudy's attorney whether someone could do the jobs Haagenson listed if that person missed work four or more days per month, Haagenson said no, not on a competitive basis. AR 134.

**ALJ DECISION**

Employing the five-step analysis associated with an application for social security benefits, the ALJ denied Goudy's claim on January 10, 2017. AR 28. At step one, the ALJ found that Goudy had not engaged in substantial gainful activity between August 31, 2013, the amended alleged onset date, and December 31, 2016, her date last insured. AR 15. At step two, the ALJ determined that Goudy suffered from the following severe impairments: obesity, bursitis in the left shoulder since January 2016, bipolar disorder, anxiety disorder, and borderline personality disorder. *Id.* And while the ALJ noted Goudy's Type II diabetes and hypothyroidism diagnoses, the ALJ found those two impairments were not severe. AR 16. At step three, the ALJ concluded that Goudy does not have an impairment, or combination of impairments, that meets or medically equals the severity required under 20 C.F.R. Part 404, Subpart P, Appendix I. *Id.* At step four, the ALJ found that Goudy had no past relevant work (AR 26) but had the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b).[1] AR 18. At step five, the ALJ

---

[1] The ALJ found that Goudy "can lift up to ten pounds frequently and twenty pounds occasionally; sit for six hours in an eight-hour workday, with normal breaks; stand and/or walk for six hours in an eight-hour workday, with normal breaks; never climb ladders, ropes or scaffolds; only occasionally climb stairs or ramps; balance as defined in the Selected Characteristics of Occupations (SCO), stoop or crouch; should never kneel or crawl; only occasionally reach overhead, with the left upper extremity; can tolerate only occasional exposure

concluded that, through the date last insured, there were jobs in the national economy that Goudy could have performed. AR 26. Thus, the ALJ determined that Goudy was not disabled between August 31, 2013, the amended alleged onset date, and December 31, 2016, the date last insured, under the Social Security Act. AR 28.

## STANDARD OF REVIEW

The court must uphold the ALJ's decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). " 'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.' " *Teague*, 638 F.3d at 614 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). When reviewing the record, "the court 'must consider both evidence that supports and evidence that detracts from the Commissioner's decision.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007)). If the Commissioner's decision is supported by substantial evidence in the record as a whole, the court may not reverse it merely because substantial evidence also exists in the record that would support a contrary position or because the court would have

---

to work around hazards, such as dangerous moving machinery, and unprotected heights; is limited to understanding, remembering and carrying out short, simple instructions; interacting appropriately with coworkers on an occasional basis and should have no contact with the general public as part of the job." AR 18.

determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commissioner's construction of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

**THE FIVE STEP PROCEDURE FOR DISABILITY DETERMINATIONS**

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(3)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). An ALJ must apply a five-step procedure when determining if an applicant is disabled. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993). The steps are as follows:

**Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b); 20 C.F.R. § 416.920(b).

**Step Two**: Determine whether the applicant has an impairment or a combination of impairments that are severe. 20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c).

**Step Three**: Determine whether any of the severe impairments identified in Step Two match the listing in Appendix 1. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 416.920(d).

**Step Four**: Considering the applicant's RFC, determine whether the applicant can perform any past relevant work. 20 C.F.R. § 404.1520(f); 20 C.F.R. § 416.920(f).

**Step Five**: Determine whether any substantial gainful activity exists in the national economy that the applicant can perform. 20 C.F.R. § 404.1520(g); 20 C.F.R. § 416.920(g).

## DISCUSSION

Goudy urges the court to reverse the ALJ's decision for two reasons. First, Goudy argues that the ALJ should have given proper weight to Dr. Christopherson's opinion. Second, Goudy argues that the ALJ failed to pose a complete hypothetical question to the vocational expert.

### I. The ALJ gave appropriate weight to the opinion of Dr. Christopherson.

Goudy argues that the ALJ did not give proper weight to Dr. Christopherson's opinion in accordance with 20 C.F.R. § 404.1527(c) and SSR 96-2p. Docket 13 at 17. Goudy alleges that controlling weight should have

been given to the opinion of Dr. Christopherson, a treating psychiatrist, because his opinion was well-supported and not inconsistent with other substantial evidence in the record. *Id.*

In step four, the ALJ must determine the claimant's RFC. 20 C.F.R. § 404.1520(a)(4). A claimant's RFC "is the most [she] can still do [in a work setting] despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). " 'The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.' " *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). The RFC must include limitations from both severe and non-severe medically determinable impairments. SSR 96-8p, 1996 WL 374184, at *5 (SSA 1996).

20 C.F.R. § 404.1527(c) provides that if the ALJ finds that a "treating source's medical opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." But a treating physician's opinion "is not conclusive because the record must be evaluated as a whole." *Finch*, 547 F.3d at 936 (internal quotation omitted). If the ALJ does not give the treating source's opinion controlling weight, the ALJ should consider several factors in weighing it, such as the length and frequency of the treatment relationship, the nature

12

and extent of the treatment relationship, and whether the medical source provides evidence to support the opinion. 20 C.F.R. § 404.1527(c). The ALJ must "always give good reasons" for the weight given to the treating physician. *Id.* "Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." *Id.*

Here, the ALJ gave Dr. Christopherson's opinion little weight after concluding the limitations identified by Dr. Christopherson were inconsistent with the record as a whole. AR 25-26. In support, the ALJ discussed the Mental Impairment Questionnaire completed by Dr. Christopherson on February 17, 2016. *See* AR 793. The Questionnaire contained a checkbox section listing mental abilities and aptitudes necessary to do unskilled work, which included five degrees of limitations: unlimited or very good, limited but satisfactory, seriously limited, unable to meet competitive standards, and no useful ability to function. *Id.* The ALJ found that the limitations marked on the Questionnaire by Dr. Christopherson were inconsistent with other evidence in the record and listed some examples to support that conclusion. AR 25.

The court finds that substantial evidence supports the ALJ's determination that the checked boxes on the Questionnaire filled out by Dr. Christopherson were inconsistent with the record as whole. *See Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (noting that "a conclusory checkbox form has little evidentiary value when it cites no medical evidence, and provides little to no elaboration." (internal quotation omitted)). There is ample evidence in the record indicating that Goudy's medical progress fluctuated—

13

sometimes she negatively reacted to medications and had bad days, but other times she improved with medication or made positive progress in therapy. Such progress, with evidence to support a finding that Goudy's impairments could be medically managed with medication, is inconsistent with Dr. Christopherson's Questionnaire limitations. In fact, much of the medical evidence from progress notes prepared by Dr. Christopherson supports the ALJ's factual findings. *See* AR 588 (Dr. Christopherson noting that Goudy has refused to participate in DBT); AR 753-58 (Dr. Christopherson notes indicating Goudy occasionally responded well to medication changes). The ALJ thoroughly summarized Goudy's medical history, treatment records, and providers' opinions in determining Goudy's RFC. Thus, considering the record as a whole, the ALJ did not err in giving little weight to the limitations marked on the Questionnaire by Dr. Christopherson.

## II.   The ALJ posed a proper hypothetical question to the vocational expert.

In step five, the ALJ must consider the claimant's RFC, age, education, and work experience to determine whether the claimant can adjust to other types of employment. *See* 20 C.F.R. § 404.1520(a)(4)(v). At this step, the ALJ must provide evidence to show "that other work exists in significant numbers in the national economy" that the claimant can perform. 20 C.F.R. § 404.1560(c)(2). An ALJ commonly poses hypothetical questions to a vocational expert to determine whether jobs are available in the national economy for someone with the claimant's impairments. *See Cox v. Astrue*, 495 F.3d 614, 620-21 (8th Cir. 2007). "Testimony from a vocational expert is

14

substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Id.* at 620. "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001). The hypothetical does not need to "frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the 'concrete consequences' of those impairments." *Lacroix*, 465 F.3d at 889 (quoting *Roe v. Chater*, 92 F.3d 672, 676-77 (8th Cir. 1996)).

Goudy argues that the ALJ's hypothetical to the vocational expert failed to include all of the limitations resulting from Goudy's impairments. Docket 13 at 13. The ALJ asked the following hypothetical during the hearing:

> Q: [A]ssume the individual of Claimant's age, education, past work experience, who has the residual functional capacity to lift up to 10 pounds frequently and 20 pounds occasionally; to sit about six hours in an eight-hour day with normal breaks; to stand and/or walk about six hours in an eight-hour day with normal breaks. The individual should never climb ladders, ropes or scaffolds; only occasionally climb stairs or ramps; balance as defined in the SCO; stoop or crouch; should never kneel or crawl; only occasionally reach overhead with the left upper extremity; can tolerate only occasional exposure to work around hazards, such as dangerous moving machinery and unprotected heights; is limited to understanding, remembering and carrying out short, simple instructions; interacting appropriately with coworkers on an occasional basis and should have no contact with the general public as part of the job. Could such an individual perform work existing in the regional or national economies?

AR 133.

According to Goudy, the mental health limitations noted by Dr. Christopherson, the function limitations found by the state agency physicians, the medical records, and Goudy's testimony show that the ALJ failed to include three additional limitations in her hypothetical: maintaining attention, concentration, and pace; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to deal with normal work stress. Docket 13 at 14.

The court disagrees with Goudy's argument. The ALJ only needs to include "those impairments that the ALJ finds are substantially supported by the record as a whole" in the hypothetical question. *Lacroix*, 465 F.3d at 889 (internal citation omitted). Notably, the ALJ's hypothetical in this case is nearly identical to the ALJ's RFC. *See* AR 18.

First, Goudy references the limitations noted by Dr. Christopherson in the Questionnaire he filled out for Goudy in February 2016, and how these mental limitations should have been included in the ALJ's hypothetical. Docket 13 at 15. The court agrees with the Commissioner that Goudy is essentially restating her argument challenging the weight accorded to Dr. Christopherson's medical opinion by the ALJ. *See* Docket 14 at 12. Such weight is analyzed under a claimant's RFC, not in step five.

Second, Goudy points out that the ALJ herself determined that Goudy has moderate difficulties in maintaining concentration, persistence, and pace, but failed to include this limitation in the hypothetical. Docket 13 at 15. In *Newton v. Chater*, the ALJ found that the claimant "often" had deficiencies of

concentration, persistence, or pace, but the hypothetical presented to the vocational expert did not include this specific impairment regarding concentration, persistence, or pace. 92 F.3d 688, 691 (8th Cir. 1996). The Eighth Circuit found that the vocational expert's opinion did not constitute substantial evidence to support the Commissioner's decision because the hypothetical failed to include these deficiencies. *Id.* at 695. While the hypothetical did limit the claimant to performing simple jobs, the Eighth Circuit noted that on cross-examination the vocational expert stated that the claimant's concentration and persistence problems would affect his ability to work regardless of what the job required. *Id.* Thus, the Eighth Circuit concluded that the claimant's concentration, persistence, or pace deficiencies should be included in the hypothetical on remand. *Id.*

Summarizing *Newton* one year later, the Eighth Circuit stated that "the reference to simple jobs in the hypothetical was not enough to constitute inclusion of" the concentration, persistence, or pace impairments. *Brachtel v. Apfel*, 132 F.3d 417, 421 (8th Cir. 1997). In *Brachtel*, the hypothetical "included the ability to do only simple routine repetitive work, which does not require close attention to detail[,]" and noted that the claimant should not work at more than a regular pace. *Id.* (internal quotations omitted). Noting that the close attention to detail and regular pace limitations encompassed the claimant's concentration, the Eighth Circuit held that "[w]hile this is scantly more than what was included in the *Newton* hypothetical, it is enough." *Id.*

The court finds that this case is more similar to *Brachtel* than it is to *Newton*. The ALJ here did not merely limit Goudy to performing simple jobs. Rather, the ALJ's hypothetical, mirroring the ALJ's RFC finding, limited Goudy to "understanding, remembering and carrying out short, simple instructions." AR 133. This limitation sufficiently encompassed Goudy's moderate difficulties in maintaining concentration, persistence, and pace.

Third, Goudy argues that the ALJ failed to include all the functional limitations found by the state agency physicians. Docket 13 at 16. Goudy cites to the state agency physicians' notations in a checkbox list that Goudy was "moderately limited in her ability to maintain concentration for extended periods" and "moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors." Docket 13 at 16 (citing AR 170, 184-85).

Goudy's argument appears to go to the weight given to medical sources by the ALJ in determining a claimant's RFC rather than whether the ALJ gave a properly-phrased hypothetical to the vocational expert. And because the weight given to medical sources is determined for purposes of identifying a claimant's RFC, it has no bearing on whether a hypothetical question was proper. *See Lacroix*, 465 F.3d at 888 n.3 ("Each step in the disability determination entails a separate analysis and legal standard."). In any event, the ALJ was not required to adopt the state agency physicians' findings if she found them inconsistent with the record as a whole. *See Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995) (noting that an "ALJ may reject the conclusions

18

of any medical expert, whether hired by a claimant or by the government, if inconsistent with the medical record as a whole.").

The hypothetical here captured the concrete consequences of Goudy's impairments. *Lacroix*, 465 F.3d at 889 (quoting *Roe*, 92 F.3d at 676-77). The ALJ's hypothetical mirrored her RFC finding, which Goudy has not challenged on appeal. The court finds the hypothetical was based on substantial evidence in record. Thus, the ALJ's reliance on the vocational expert's testimony in step five was proper.

## CONCLUSION AND ORDER

The ALJ allocated proper weight to Dr. Christopher's opinion based on the record as a whole. Additionally, the ALJ relied on vocational expert testimony elicited from a properly-phrased hypothetical. Because substantial evidence supports the ALJ's decision,

IT IS ORDERED that the decision of the Commissioner is affirmed.

Dated November 26, 2018.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE